15619

BLOCKER v. HUNDERTMARK *ET AL.*

(28 S. E. (2d), 855)

270

December, 1942.

*Mr. J. W. Manuel,* of Hampton, S. C., Counsel for Appellant,

*Messrs. Warren & Warren,* of Hampton, S. C., Counsel for Respondent,

January 31, 1944.

Mr. Associate Justice Baker delivered the unanimous Opinion of the Court:

For some years prior to 1940, and during that year up to the time of his death on November 18, 1940, C. W. Kress of New York owned and operated a plantation of about 10,-000 acres of land near Yemassee (Hampton County), South Carolina, which was generally known locally as Buckfield Plantation. The lands were diversified, there being open, farming lands, timber and woods land and swamp lands.

C. Hundertmark was the manager of the plantation, in charge of its office, books, property and activities, except the farming operations.

On August 11, 1940, a tropical storm hit the plantation and did considerable damage to the timber thereon. When this damage was promptly reported to Kress by Hundertmark, Kress expressed a willingness to have him decide the matter of salvaging and selling the logs and fallen trees. Whereupon, Hundertmark entered into a verbal contract with the respondent for the purchase and removal by respondent of the storm-damaged timber from certain areas of Buckfield Plantation, and on August 22, 1940, the respondent wrote a letter to Buckfield Plantation reading in part as follows: "With further reference to our conversation regarding the purchase of the timber on Buckfield Plantation, which is the storm and damaged timber," and then named the prices to be paid therefor.

On November 18, 1940, C. W. Kress, the owner, died leaving a will naming The Chemical Bank & Trust Company as the executor and trustee (the appellant herein). This bank qualified in New York on December 11, 1940, and ancillary letters were granted by the Probate Judge of Hampton County, South Carolina, on March 29, 1941.

Hundertmark remained in charge of Buckfield Plantation, and on December 1, 1940, wrote to respondent a letter as follows:

"With further reference to our conversation, I herewith wish to state that I have agreed to let you cut the storm damaged timber on this plantation, located between the Foxville Road, Feed Strip 'E', the Retreat Road, and the rice fields, as well as the plantation timber (storm damaged) on the east side of the Atlantic Railroad belonging to the tract called 'Whitehouse.'

"The above mentioned areas were not included in our original agreement of August 24th, because they were restricted for the quail shooting of Mr. Kress. Since the latter's death, I have been authorized to include these areas.

"It is also understood that you are to clean up all debris in connection with this operation, leave roads in the same re-

pair you find them, and pay at the rate of $5.00 per thousand stumpage, as heretofore."

It will be noted of course that this letter merely extended the area from which the storm-damaged timber could be cut and removed.

On January 16, 1941, Hugh Weir telegraphed Hundertmark, "Please revise timber operations to permit withdrawal of only fallen timber. Letter follows."

On January 22, 1941, Hugh Weir, the trust officer of The Chemical Bank & Trust Co., Executor as aforesaid, wrote to Hundertmark in part as follows:

"I have received your letter of January 20 together with the photographs. These give some idea of the storm damage to the trees. With regard to the timber operations, we have been and still are satisfied that the arrangement made by you in connection with the sale of the damaged timber was in the best interests of the Estate. When we recently met with Mr. Dunk this matter was discussed and he informed us of the careful investigation made by you and him before the contract was made and we are convinced that you obtained as high a price as could have been done under the circumstances. However, we did hear of several rumors to the effect that the Estate was not receiving full value for the timber being hauled from the property, and upon further investigation it appeared that the only point involved was the cutting of standing timber which had been damaged by the storm. Upon taking the matter up with Mr. Brewster he indicated that standing timber although partially damaged could be sold at a higher price and left standing it would not deteriorate. We therefore thought it advisable to restrict the present operation to fallen or partially fallen timber until we could investigate the advisability of cutting standing timber. In this connection we have requested Mr. Stoddard to arrange to have Mr. Brewster submit a further report as to the advisability of cutting a part of this timber."

Following the receipt of the telegram and letter from the trust officer of appellant, Hundertmark issued instructions to respondent to restrict the cutting and removal of timber to fallen or partially fallen timber; and in May, 1941, upon instructions from appellant, stopped respondent from cutting and removing any timber whatsoever.

This action followed for the breach of the contract, resulting in a judgment in favor of respondent in the sum of $3,000.00.

The exceptions of the appellant are lengthy and in detail, but in its brief the appellant has narrowed the issues to two, (1) Was the contract, sued upon, in writing, as required by law, and (2) Was the alleged extension of contract, letter from C. Hundertmark to Arthur Blocker (respondent), December 1, 1940, ratified by the defendant (appellant) Chemical Bank & Trust Company, through its trust officer, Hugh Weir?

We do not deem it necessary to here set out the statute of frauds, but will comment thereon. The complaint, after setting forth the terms of the contract, alleges that the "contract was evidenced by writing."

The statute of frauds merely requires some memorandum or note of the agreement relating to real estate to be in writing and signed by the party charged therewith or his agent, and does not require a formally executed contract. There must be written evidence of the contract, if there is no written contract, and our court has gone so far as to hold that a letter which recites the contract, but repudiates it, is sufficient. *Colleton Realty Co. v. Folk,* 85 S. C., 84, 67 S. E., 156. As stated in 37 C. J. S., Frauds, Statute of, § 174: "The note or memorandum is not the contract, but only the written evidence of it required by statute."

In this case the first written memorandum (dated August 22, 1940) was signed by the plaintiff only. If there had been nothing further, this would be in-

sufficient, because not signed by the owner of the land or his agent.

But later there was a letter dated December 1, 1940, signed by Hundertmark, agent of the owner, extending the contract to other areas, and incidentally affirming the original contract.

Although the letter of December 1, 1940, was written after the death of Kress, the original owner, the evidence tends to show that Hundertmark continued to act as agent for Hugh Weir, trust officer of the executor, and Weir's letter dated January 22, 1941, affirms the contract, for he states that they had been, and still were, satisfied with the arrangement made by Hundertmark "in connection with the sale of the damaged timber." It is true Weir goes further in this letter and states that they had decided "to restrict the present operation to fallen or partially fallen timber." But having made the contract, they did not have the right to restrict it.

In our opinion there was sufficient memorandum in writing to take the case out of the statute of frauds, and sufficient evidence of ratification of the contract by appellant to require the submission of this issue to the jury.

All exceptions are overruled, and the judgment is affirmed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES and CIRCUIT JUDGES WM. H. GRIMBALL and PHILIP H. STOLL, ACTING ASSOCIATE JUSTICES, concur.